The BUCKEYE CELLULOSE
CORPORATION, Plaintiff,

v.

ATLANTIC MUTUAL INSURANCE
COMPANY, Defendant.

No. 82 Civ. 7411(MEL).

United States District Court,
S.D. New York.

July 15, 1985.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff; Vincent J. Ryan, Brian M. Murphy, George W. Clarke, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; Joseph J. Magrath, New York City, of counsel.

LASKER, District Judge.

Buckeye Cellulose Corporation ("Buckeye") moves for summary judgment to establish that its insurance contract with defendant Atlantic Mutual Insurance Company ("Atlantic") applies to a lost cargo claim based upon fraudulent conversion. Atlantic cross-moves for summary judgment to dismiss the complaint on the ground that the contract in question is ambiguous and should be construed against Buckeye. In the alternative, Atlantic argues that questions of fact preclude awarding Buckeye summary judgment. For the reasons set forth below, both motions are denied.

## I.

### The Transaction [1]

Buckeye, a subsidiary of the Proctor & Gamble Company ("Proctor & Gamble"), entered into three contracts in late December 1978 and early January 1979 to sell to the Thomas P. Gonzalez Corporation ("TPGC"), 3,500 metric tons of cottonseed oil valued at over $2.5 million. TPGC in turn had contracted to sell the oil to an agency of the Egyptian Government. Financing for these transactions were to be accomplished through inter-connecting letters of credit.

In accordance with the terms of the Buckeye-TPGC contracts, TPGC opened three irrevocable letters of credit at the Credit Lyonnais Bank in Los Angeles for the contract price of $2.5 million. The letters of credit provided that Credit Lyonnais would pay Buckeye by honoring sight drafts presented on Buckeye's behalf once Buckeye's bank, Central Trust of Cincinnati, presented to Credit Lyonnaise various documents verifying that the cargo of oil

had been completely loaded in good order and condition on the vessel M/V GLOBE VENUS. That ship had been chartered by TPGC to load cottonseed oil at Bayport, Texas, Houston and New Orleans and to carry the cargo to Alexandria, Egypt.[2]

The conditions of the letters of credit of particular importance to this case specified that Credit Lyonnais was to receive clean negotiable mates receipts on or before the amended expiration date for the letters of February 16, 1979. The mates receipts were the sole documents of title for the cargo and stated on their face that negotiable bills of lading for the oil would be issued to take the place of the receipts only if the receipts were surrendered by their holder.

After these arrangements had been made, Buckeye contracted with its suppliers to transfer 3,500 tons of cottonseed oil to the tanks of the GLOBE VENUS. The oil was loaded in the three Gulf Coast ports between January 31 and February 2, 1979, and Buckeye received from its suppliers, in return for payment to them in early February, the documents specified in the Credit Lyonnais letters of credit, including the negotiable mates receipts.

As set forth in Buckeye's Memorandum of Law in support of its motion, had the transaction between Buckeye and TPGC proceeded in a regular fashion, Buckeye would have gathered and presented the specified letters of credit documents to its bank, Central Trust, which in turn would have presented the documents together with sight drafts for $2.5 million to Credit Lyonnais. Credit Lyonnais would then have paid Buckeye the $2.5 million and would have delivered the mates receipts to TPGC, which would then have surrendered the receipts to the agent for the GLOBE VENUS, Universal Transport Corporation ("Universal"), in exchange for negotiable bills of lading. With the bills of lading in

1. Unless otherwise noted the facts discussed here are drawn from the parties' Stipulation of Facts, filed Nov. 1, 1983 (hereinafter "Stipulation of Facts").

2. Buckeye and TPGC agreed that the cottonseed oil was to be delivered F.O.B. vessel, Houston. TPGC's contract with its Egyptian purchaser provided for the sale of the oil on C & F Alexandria terms. *See* Stipulation of Facts ¶¶ 4 & 6.

hand, TPGC would have settled up with the Egyptian government agency that had contracted to purchase the cottonseed oil for payment for the oil in exchange for the bills.

In the final step of this hypothetical series of transactions, designed to maintain cargo ownership in the hands of the holder of the negotiable documents issued by the carrier, the Egyptian purchaser would have presented the bills of lading to the GLOBE VENUS in order to take delivery of the cargo.[3]

In fact, to accomplish the penultimate step of obtaining bills of lading in exchange for payment, the Egyptian purchaser actually opened a letter of credit in favor of TPGC with the Wells Fargo Bank in Los Angeles which specified, *inter alia,* that TPGC had to present negotiable bills of lading as a condition of payment.

### The Cargo Loss

The reader may by now have anticipated that all did not work out according to plan. On February 2, 1979 TPGC managed to obtain from Universal signed bills of lading for the cargo of cottonseed oil without surrendering the negotiable mates receipts. No explanation as to how this occurred is in the record. On that date, the receipts were in fact still in the hands of Buckeye's suppliers who had not yet received payment from Buckeye for the oil. TPGC nonetheless proceeded to obtain payment from the Egyptian purchaser. On February 5, 1979, TPGC presented to Credit Lyonnais the bills of lading, and other documents specified in the Wells Fargo letter of credit, and Credit Lyonnais, acting on behalf of TPGC, presented these materials to Wells Fargo for payment under the terms of the letter of credit. Wells Fargo paid Credit Lyonnais and on February 8

Credit Lyonnais applied this money against outstanding debts owed by TPGC to the bank.

In the meantime, Buckeye, ignorant of this state of affairs, proceeded to pay its suppliers for the cottonseed oil transferred to the GLOBE VENUS and in return obtained the mates receipts for the cargo from the suppliers. Buckeye had collected all the receipts by February 16 and forwarded them to Central Trust. Central Trust, in turn, mailed the receipts, and the other documents specified in the Credit Lyonnais letters of credit by registered mail to Credit Lyonnais in Los Angeles for payment of the $2.5 million owed to Buckeye by TPGC in accordance with their contracts. The documents were not received by Credit Lyonnais until February 20, 1979, four days after the February 16 expiration date for the three letters of credit.

Credit Lyonnais subsequently advised Central Trust that the letters of credit had expired and that late presentation of the specified documents would not be waived.[4] The negotiable mates receipts were then returned to Buckeye.

In contrast to the confused state of affairs between Buckeye, TPGC, and their corresponding banks, the GLOBE VENUS' journey to Egypt proceeded without incident. On February 28 the vessel arrived in Alexandria and the cargo was discharged by March 5.

On March 6 or 7, Buckeye, still ignorant as to the true facts, instructed Universal that the cargo was to be unloaded only for Buckeye's own account inasmuch as it continued to own the cottonseed oil by virtue of its retention of the mates receipts. Universal responded to this direction by notifying Buckeye that the oil had been discharged for the account of the Egyptian

---

**3.** *See* Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment, filed Nov. 1, 1983, at 6–7.

**4.** Credit Lyonnais also advised TPGC of the late presentation and TPGC responded by noting that it had already been paid by the Egyptian purchaser and that this money had been credited to debts owed by TPGC to Credit Lyonnais.

TPGC did state that it was prepared to sign notes so as to permit Credit Lyonnais to pay Buckeye. Credit Lyonnais, however, believed that TPGC would be unable to repay an additional $2.5 million loan and declined to follow this procedure. *See* Stipulation of Facts ¶¶ 24–25.

purchaser. Buckeye's subsequent efforts to claim title to the oil and alternatively to recover the $2.5 million payment from TPGC and Credit Lyonnais proved to be unavailing.

### The Atlantic Cargo Insurance Claim

The open marine cargo policy at issue in this case had insured Proctor & Gamble and its subsidiaries, including Buckeye, for cargo losses beginning in July of 1968 and was in effect at the time of sale and shipment of the cottonseed oil.[5] With the exception of a two page printed cover form prepared by Atlantic, the policy, twenty one pages, not including endorsements, was drafted by Johnson & Higgins, Proctor & Gamble's insurance broker.

On April 17, 1979, a Proctor & Gamble employee notified Johnson & Higgins of Buckeye's cargo loss as a prerequisite to making a claim under the open cargo policy. Johnson & Higgins advised Atlantic of the claim in a letter dated April 26, 1979. Atlantic, in a letter to Johnson & Higgins dated April 30, 1979, declined the claim on the ground that the cargo policy did not cover the loss because there was no physical loss or damage to the cargo.[6]

Proctor & Gamble made quarterly reports of cargo shipments to Johnson & Higgins. In the report dated May 23, 1979 for the quarter ending February 28, 1979, Proctor & Gamble did not include Buckeye's shipment of cottonseed oil. Moreover, Proctor & Gamble had never paid an insurance premium for the shipment, nor had it been billed by Johnson & Higgins for the shipment.

In April of 1979, Buckeye sued the owner of the GLOBE VENTURE, Universal, TPGC and Credit Lyonnais to recover for the loss of the cottonseed oil. The case against these parties was eventually settled out of court for approximately $2.41 million but Proctor & Gamble maintained its right to recover the remainder of its loss under the cargo policy and attorney's fees, and so advised Atlantic. The parties agree that if the lost cargo is covered by the policy Buckeye would have recovered its value which, depending upon which clause of the policy governed, would be either the cargo invoice value of approximately $2.51 million or $2.76 million, the latter figure representing 110% of the invoice value. *See* Stipulation of Facts ¶ 42.

### II.

Buckeye contends that the lost cargo of cottonseed oil was covered under the policy pursuant to Clauses 3 and 27 of the policy rider drafted by Johnson & Higgins quoted in the margin.[7] Clause 3 states that the policy covers goods in which Proctor & Gamble "may have an interest in any way" and Buckeye asserts that it continued to cover the property insured until, under Clause 27, the relevant title documents "have been taken up by the consignee[ ] and actual payment made by" it. Since the consignee in this case, TPGC's Egyptian purchaser, never received valid title documents, Buckeye contends that the policy remained in force at the time the cargo was lost through fraudulent conversion.

Buckeye also relies upon Clause 12(A), which states that the policy insures

---

**5.** This policy remained in force until March 31, 1979 when it was replaced by a new policy which was cancelled for reasons unrelated to this case. *See* Stipulation of Facts ¶ 1.

**6.** *See* Plaintiff's Exhibit 6 in Support of Its Motion for Summary Judgment, filed Nov. 1, 1983 (hereinafter "Plaintiff's Exhibit ——").

**7.** The policy is reprinted in Plaintiff's Exhibit 1. Clause 3 provides in relevant part:

To cover goods and/or merchandise of every description, ... shipped by or to the Assured [ (Proctor & Gamble) ] or by or to others for

the Assured's account or in which the Assured may have an interest in any way....

Clause 27 further states in relevant part:

ON SHIPMENTS SOLD ON SIGHT DRAFT TERMS–PAYMENT AGAINST DOCUMENTS—Notwithstanding anything to the contrary contained herein, this policy covers the Assured against loss or damage (by perils covered by this policy) to merchandise insured hereunder until the documents have been taken up by the consignees and actual payment made by them but not after delivery into consignees' warehouse....

**1188**

"[a]gainst all risk of physical loss or damage from any external cause." It argues that conversion was a covered risk under the clause.

Atlantic contends that the policy was not in force at the time of Buckeye's loss because the transaction between Buckeye and TPGC was financed through letters of credit which, in accordance with the terms of Clause 31 quoted in the margin,[8] caused the termination of coverage under the policy once the letters were opened by TPGC in Buckeye's name at Credit Lyonnais. Atlantic also refers to the prior dealings between the parties and between Buckeye and TPGC to support its claim that Buckeye did not consider the shipment of cottonseed oil at issue to be subject to coverage under the cargo policy. Atlantic particularly refers to three Buckeye-TPGC transactions for vegetable oil in the latter half of 1978 which were never reported to Atlantic and for which Atlantic contends Buckeye paid no insurance premiums.

Atlantic challenges Buckeye's reliance on Clause 27 as a basis for coverage, arguing that that provision applies only to "shipments sold on sight draft terms-payment against documents." *See* note 7, *supra.* Atlantic asserts, *inter alia*, that the various Buckeye documents relating to the contracts between Buckeye and TPGC for cottonseed oil either fail to specify payment terms or refer only to the Credit Lyonnais letters of credit and that therefore Clause 27 is inapplicable.

Atlantic also disputes Buckeye's contention that the cargo policy applies to fraudulent conversion of a cargo. Atlantic as-

serts that conversion is not one of the traditional marine "perils" enumerated on its printed form attached to the policy and that no conversion occurred in any event because the actual voyage of the cottonseed oil from the United States to Egypt occurred without physical incident.[9] Finally, Atlantic argues that Buckeye's failure to declare the cargo as subject to insurance coverage should be regarded as evidence that it did not believe that the shipment was covered by Atlantic's policy.

Buckeye responds that Clause 31, which terminated coverage once the letters of credit were opened in Buckeye's name, is inapplicable to the facts of this case because Buckeye financed its transaction with TPGC with both letters of credit and "payment against documents" terms, the latter provision giving rise to the application of Clause 27, which applies to "shipments sold on sight draft terms-payment against documents." Clause 31, in Buckeye's view, is supplemental to the policy and therefore separately enforceable. Buckeye also argues that policy coverage should not be denied on the ground that Atlantic was not provided with a declaration for the cottonseed oil shipment because Johnson & Higgins' failure to include the claim occurred only after Atlantic notified the broker of its decision to decline to cover for the loss and a report therefore would have been futile. Finally, Buckeye asserts that its failure to declare the 1978 shipments involving TPGC does not mean that it waived coverage for the cargo or conceded that it was not covered. Buckeye contends that, far from believing that the cargo was undeclarable, it had a compelling

---

8. Clause 31(A) provides in relevant part:
   This policy is extended to cover the interest of The Buckeye Cellulose Corporation with respect to export shipments sold on F.A.S., F.O.B. or similar terms whereby insurance for the ocean voyage by others than the Assured [ (Proctor & Gamble) ]. This insurance to attach at the time title and risk of loss passes to the buyer and covers continuously thereafter, subject to all the terms and conditions of this policy, until the Assured receives payment and/*or an irrevocable letter of credit is opened in the name of the Assured whichever first occurs.* (Emphasis added).

9. Atlantic also challenges the "all risk" scope of coverage found in Clause 12(A) because it is contradicted by the language found in Clause 12(D). It is unclear, however, whether 12(D) remains in force in light of multiple endorsements to the policy, most notably Endorsement No. 18 dated July 30, 1971 which cancelled earlier endorsements amending the provision. As a result, we do not attribute any weight to Atlantic's argument in the absence of a persuasive explanation of the effect of these endorsements upon the scope of the policy.

reason for declaring this shipment in light of the fact that, unlike the usual transaction in which it would give up its interest in the cargo soon after loading aboard the vessel, the failure of the Credit Lyonnais letters of credit meant that it had to assume the risk of loss and insurable interest in the cargo for the entire voyage to Egypt without prior notice. They do not, however, explain why, if there was such a compelling reason to declare, no declaration was made.

### III.

■ In light of the foregoing arguments, we find, drawing reasonable inference in favor of Buckeye and Atlantic respectively, that questions of fact preclude awarding summary judgment to either party. Notwithstanding Atlantic's contention, termination of policy coverage under Clause 31 does not extinguish the policy because that provision is supplemental to the policy since it *extends* coverage for Buckeye's benefit and requires Buckeye to pay an additional premium. If Clause 31 constituted the sole basis for coverage then Atlantic would be correct that the opening of the TPGC letters of credit on Buckeye's behalf at Credit Lyonnais would have terminated coverage. However, if another clause in the policy provided for continuing coverage, the operation of Clause 31 would not in itself determine whether the policy was in force at the time of Buckeye's loss.

■ In this case, Buckeye asserts that Clause 27 determines whether the policy was in effect when the cargo was lost and we find that a question of fact exists as to whether that provision is applicable to the Buckeye-TPGC transaction. As discussed *supra*, Clause 27 applies to "shipments sold on sight draft terms-payment against documents" and states, *inter alia*, that policy coverage continues until title documents have been taken up by the consignee.

Although this clause might support Buckeye's contention that the policy was in effect at the time the cottonseed oil was lost, it is not clear whether the provision applies to the Buckeye-TPGC transaction. Buckeye's confirmation forms which describe its three contracts for cottonseed oil with TPGC do not specify the financing terms of the agreement, but instead leave blank the lines on the documents which describe the transactions' financing terms. In addition, Buckeye's shipping invoices for the cottonseed oil refer only to the three Credit Lyonnais letters of credit in the box on each invoice left open for terms. *See* Exhibits B–G attached to Affidavit of Joseph J. Magrath 3d, filed Dec. 9, 1983. These documents are sufficient to create a fact question regarding whether "payment against documents" was actually one of the terms in the Buckeye-TPGC transaction in addition or as a complement to the Credit Lyonnais letters of credit. Accordingly, neither party is entitled to summary judgment.

■ Other questions of fact relate to the scope of coverage under the policy and the parties' understanding of the scope. Although portions of the policy appear to possess a quality akin to transluscent glass, Atlantic has not established, as a matter of law, that its policy does not provide coverage for conversion of a cargo resulting from fraudulent procurement of bills of lading. Clauses 3 and 12(A) state respectively that the policy covers goods in which Proctor & Gamble "may have an interest in any way" and that goods are insured "[a]gainst all risks of physical loss or damage from any external cause...." We find these terms to be sufficiently expansive in their "plain meaning" to support an inference favorable to Buckeye that the policy might have covered the kind of cargo loss at issue in this case. *See, e.g., Murray Oil Products, Inc. v. Royal Exchange Assurance Co.,* 21 N.Y.2d 440, 445–446, 235 N.E.2d 762, 764, 288 N.Y.S.2d 618, 620–21 (1968) (finding insurance policy intended to cover every possible contingency).

On the other hand, Buckeye's failure to declare the shipment of cottonseed oil, or to pay insurance premiums upon it, and its failure to report earlier shipments arising out of transactions with TPGC supports the

inference favorable to Atlantic that it did not believe that conversion was a covered risk and that its transactions with TPGC were subject to coverage under Atlantic's cargo policy. These inferences accordingly provide further support for denying summary judgment to both parties.

We conclude that in spite of the wide area of agreement between the parties as to the facts, we are unable to discern the meaning of the various clauses of the policy on papers alone. Because the construction of the policy is not self-evident, even as supplemented by the agreed facts, its meaning will have to be determined on the basis of the testimony of appropriate witnesses so that findings as to the intention of the parties can be made.

Plaintiff's motion and defendant's cross-motion for summary judgment are denied.

It is so ordered.