The **BUCKEYE CELLULOSE CORPORATION, Plaintiff,**

v.

**ATLANTIC MUTUAL INSURANCE COMPANY, Defendant.**

No. 82 Civ. 7411(MEL).

United States District Court, S.D. New York.

Sept. 17, 1986.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff; Vincent J. Ryan, George W. Clarke, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; Joseph J. Magrath, 3rd, of counsel.

LASKER, District Judge.

This case concerns the question of whether the seller of an ocean shipment of cottonseed oil can recover from its insurance carrier under an open marine cargo insurance policy for conversion of cargo resulting from fraudulent procurement of bills of lading. The issues were initially presented to the court on cross-motions for summary judgment, both of which were denied, the court concluding

> that in spite of the wide area of agreement between the parties as to the facts, we are unable to discern the meaning of the various clauses of the policy on papers alone. Because the construction of the policy is not self-evident, even as supplemented by the agreed facts, its meaning will have to be determined on the basis of the testimony of appropriate witnesses so that findings as to the intention of the parties can be made.

*Buckeye Cellulose Corp. v. Atlantic Mutual Insurance Co.*, 612 F.Supp. 1184, 1190 (S.D.N.Y.1985). After hearing the testimony of five witnesses and examining a number of documents presented at a two day non-jury trial, I now conclude that the insurance policy at issue did not apply to the lost cargo claim and that the defendant is entitled to judgment accordingly.[1]

## I.

There is little dispute between the plaintiff, Buckeye Cellulose Corporation ("Buckeye"), and the defendant, Atlantic Mutual Insurance Company ("Atlantic"), as to the basic facts underlying the transaction, the cargo loss, and the conduct of the parties regarding the subject insurance policy.[2]

### A.

Buckeye, a subsidiary of the Procter & Gamble Company ("P & G"), entered into three contracts in late December 1978 and early January 1979 to sell to the Thomas P. Gonzalez Corporation ("TPGC") 3500 metric tons of cottonseed oil valued at over $2.5 million. The three broker's contracts each contained after the legend, "TERMS," the printed language: "Sight Draft. Bill of Lading, attached, free of exchange to buyer." The three contracts also contained after the legend, "REMARKS," the typewritten language respectively: "Letter of credit to be opened by January 12, 1979," "Letter of credit to be opened five (5) days prior to loading," and "Letter of credit to be opened five (5) days prior to shipment." Each contract provided that the oil was to be delivered "F.O.B. vessel" at Texas and Louisiana ports.[3]

TPGC had contracted in turn to sell the oil to an agency of the Egyptian government. For this purpose, TPGC chartered the vessel M/V Globe Venus to load cottonseed oil at Bayport and Houston, Texas and New Orleans, Louisiana for carriage to Alexandria, Egypt.

In accordance with the terms of the Buckeye-TPGC contracts, TPGC opened three irrevocable letters of credit at the Credit Lyonnais Bank in Los Angeles for the contract price of the oil. The three letters were issued on January 22, 1979 and were to expire on February 12,[4] although the expiration dates were later amended to February 16. The letters of credit provided that Credit Lyonnais would pay Buckeye upon presentation of sight drafts accompanied by clean negotiable mate's receipts, among other specified documents, which verified that the cargo of oil had been completely loaded in good condition on the

---

1. To the extent that findings and conclusions herein differ from those contained in the memorandum opinion on the motion for summary judgment, those differences are attributable to the amplification of the record at trial.

2. Unless otherwise noted, the facts found in sections I–A through I–C of this Memorandum are drawn from the parties' October 31, 1983 Stipulation of Facts.

3. Plaintiff's Exhibit (hereafter "PX") 2 (broker's confirmations).

4. PX 3 (letters of credit).

M/V Globe Venus. In a separate transaction, the Egyptian consignee to whom TPGC had contracted to sell the oil opened a letter of credit at Wells Fargo Bank in Los Angeles. The Wells Fargo letter of credit provided that TPGC would receive payment for its part in the deal upon presentation of negotiable bills of lading, among other documents. These bills of lading, which would serve the ultimate purpose of authorizing the Egyptian consignee to take up the cargo in Alexandria, were to be issued by the agent for the Globe Venus, Universal Transport Corporation ("Universal"), upon surrender by TPGC of the corresponding mate's receipts. A stamped legend on the face of the mate's receipts stated: "BILL OF LADING NOT TO BE ISSUED UNTIL ORIGINAL DULY SIGNED AND ENDORSED MATES RECEIPT HAS BEEN SURRENDERED IN EXCHANGE FOR BILL OF LADING." [5]

The foregoing arrangements having been made, Buckeye contracted with its suppliers to have 3500 metric tons of cottonseed oil delivered to the tanks of the Globe Venus. The oil was loaded at the three Gulf Coast ports between January 31 and February 2, 1979, and Buckeye received from the suppliers, in return for payment to the suppliers in early February, the negotiable mate's receipts and other documents that had been issued at the time of the actual physical delivery of the oil.

Had the transaction proceeded at this juncture in a regular fashion, Buckeye would have presented the documents and mate's receipts specified in TPGC's letter of credit along with sight drafts for some $2.5 million to Credit Lyonnais. Credit Lyonnais would then have paid Buckeye, taken up the documents, and delivered the mate's receipts to TPGC. TPGC would in turn have surrendered the mate's receipts to Universal in exchange for negotiable bills of lading, which it would then have presented along with other required documents to Wells Fargo in order to obtain payment under the terms of the Egyptian consignee's letter of credit. With the bills of lading in hand, the Egyptian consignee would then have proceeded to take delivery of the oil in Alexandria.

### B.

The actual series of transactions followed a different progression. As described above, all the cottonseed oil in the shipment passed the ship's rail from various ports by February 2, 1979, at which time the Globe Venus set sail for Egypt. It was also on February 2 that TPGC succeeded in obtaining bills of lading for the shipment from Universal, the vessel's agent, without surrendering the required mate's receipts. (Although no explanation for this irregularity has emerged from the litigation of this case, it is not an issue between the parties.) In fact, on February 2 the mate's receipts were still in the hands of Buckeye's suppliers, who had not yet been paid for the oil.

Bills of lading in hand, TPGC proceeded to obtain payment from the Egyptian consignee, accomplishing this by presenting the bills of lading and other documents required in the Wells Fargo letter of credit to Wells Fargo for payment. Wells Fargo paid on the letter of credit on February 8, 1979, and Credit Lyonnais applied the funds to various debts owed to Credit Lyonnais by TPGC.

At the same time that these transactions were taking place unbeknownst to Buckeye, Buckeye went ahead and paid its suppliers for the cottonseed oil delivered to the Globe Venus, receiving the negotiable mate's receipts in return. Buckeye did not obtain all the mate's receipts from its suppliers until February 16, and it was not until February 20 that Credit Lyonnais received from Buckeye's agent, Central Trust Company of Cincinnati, all of the documents and mate's receipts required under the letter of credit terms. The letters of credit, however, had expired on February 16. Credit Lyonnais advised Central Trust that late presentation of the documents would not be waived and returned the ne-

---

5. PX 6 (mate's receipts).

gotiable mate's receipts to Buckeye. Although TPGC had already been paid by the Egyptian consignee, the funds having been credited against debts owed by TPGC to Credit Lyonnais, and TPGC offered upon learning of the late presentation to sign notes to Credit Lyonnais so as to permit the bank to pay Buckeye, Credit Lyonnais refused to follow this course because it believed that TPGC's financial condition would not permit it to repay a $2.5 million loan.

The Globe Venus arrived in Alexandria on February 28, and the cargo was unloaded by March 5. As late as March 6 or 7, Buckeye, still ignorant as to the true facts regarding the improper release of the bills of lading covering the cargo, instructed Universal that the cottonseed oil was to be unloaded only for Buckeye's own account since it continued to hold title to the cargo by virtue of its retention of the mate's receipts. At this point Buckeye expected to be able to resell the oil at a price higher than the contract price with TPGC, given then-current market conditions. Shortly thereafter, but no later than March 9 (as evidenced by a telex from Buckeye to TPGC and Universal notifying them that Buckeye had cabled the Egyptian purchaser on that date regarding its claim of title to the oil),[6] Buckeye learned of the unauthorized issuance of the bills of lading to TPGC and that TPGC had been paid by the Egyptian consignee. A March 14 telex from Universal to Buckeye confirmed that the oil had been discharged to shore tanks for the account of the Egyptian consignee.[7] Buckeye's attempts to assert control over the cargo or alternatively to secure payment of the contract price from TPGC and Credit Lyonnais were unsuccessful.

## C.

In April 1979 Buckeye sued the owner of the Globe Venus, Universal, TPGC, and Credit Lyonnais to recover for the loss of the cottonseed oil. The case was eventually settled out of court for $2,412,500. P & G, however, maintained its right to recover the remainder of its loss under the cargo insurance policy issued by Atlantic that was in effect at the time of the sale and shipment of the cottonseed oil cargo which is the subject of this lawsuit. The parties agree that if the loss is covered by the policy, the insured value of the shipment is either the cargo invoice value of approximately $2.51 million or 110% of that sum—$2.76 million—depending on which clause of the policy would govern.

The insurance contract that lies at the heart of this litigation is an open marine cargo policy that insured P & G and its subsidiaries, including Buckeye, for cargo losses beginning in 1968 and continuing through the period relevant to this litigation. By telephone and letter on April 17 and 18, 1979 respectively, P & G informed its insurance broker, Johnson & Higgins, of the circumstances of the cargo loss.[8] Johnson & Higgins subsequently advised Atlantic of the loss by letter dated April 26 in keeping with the normal mode of communication between underwriter and assured.[9] In a letter dated April 30, Atlantic informed Johnson & Higgins that it was declining the claim, stating:

As we understand the situation, our assured has "lost" a shipment of cottonseed oil valued at $2,506,539.00 as a result of what appears to be a breakdown of a rather complex financial arrangement covering sale of this cargo.

. . . .

There is no indication in the documentation forwarded to us of any physical loss or damage to the cargo in question. We presume the shipment was received sound and intact by the Egyptian consignee and should this be the case, you

---

6. PX 7 (telex from Buckeye to TPGC and Universal).

7. PX 8 (telex from Universal to Buckeye).

8. PX 11 (letter from P & G to Johnson & Higgins noting loss).

9. PX 12 (letter from Johnson & Higgins to Atlantic noting claim).

will appreciate we would not be involved in this matter.[10]

The parties have stipulated that Atlantic took the positions that the occurrence of loss was not covered under the insurance policy, as well as that the shipment in suit was not insured under the policy.[11]

The regular and accepted practice between the parties as to the reporting or declaration of shipments covered under the insurance policy was for P & G to make such reports on a quarterly basis to Johnson & Higgins, which would in turn advise Atlantic. The purpose of the quarterly reports was to identify the value of cargo shipments covered under the policy so as to permit the calculation of premiums owed to Atlantic.[12] In the report dated May 23, 1979, covering the three-month period ending February 28, 1979, P & G did not include the Buckeye cottonseed oil shipment; nor did Johnson & Higgins' May 30 premium invoice for P & G, which appears to correspond to the May 23 quarterly report, charge P & G an insurance premium for the cottonseed oil shipment.[13]

### D.

The open marine cargo policy at issue consists of a two-page printed cover form prepared by Atlantic and twenty-one typewritten pages and numerous endorsements drafted or compiled by P & G and Johnson & Higgins, acting as P & G's agent.[14] While they differ in their interpretation of the policy clauses and their application to the loss in suit, both sides agree that the policy "was a conglomeration of things, it wasn't designed to be [ ]consistent internally, it sort of grew like topsy" (counsel for plaintiff)[15] and could be "refer[red] to ...

as a hodgepodge of clauses" (defendant's expert).[16] The court joins in this sentiment.

Set forth below are the controlling clauses of the insurance policy, the relevance of which, may become apparent only upon further reading. Clause 3 provides in pertinent part that goods covered under the policy include

goods and/or merchandise of every description, under and/or on deck, shipped by or to the Assured or by or to others for the Assured's account or in which the Assured may have an interest in any way....[17]

Clause 12(D), as amended by Endorsement No. 13 (dated Oct. 6, 1970), provides that bulk oils and liquids such as the shipment of cottonseed oil in this case are insured:

Subject Particular Average Irrespective of Percentage

(1). Notwithstanding these With Average conditions, this insurance

(a) to pay for actual shortage and/or loss in weight and/or leakage from any external cause (excluding risks excepted by the F.C. & S. and S.R. & C.C. Warranties unless covered elsewhere herein), excluding however all claims for unexplained shortage and/or loss in weight; but Assurers to be liable only for insured loss in excess of one-half of one percent (½ of 1%) of the insured value of the shipped contents of the tank, which one-half of one percent (½ of 1%) shall be deducted in all settlements.

(b) to pay for loss by contamination however arising, irrespective of percentage....[18]

---

10. PX 13 (letter from Atlantic to Johnson & Higgins declining claim).

11. Stipulation of Facts ¶ 37 (Oct. 31, 1983).

12. Trial Transcript (hereafter "Tr.") at 96–103, 128–32 (testimony of David Welles, Vice President, Cargo Division, Johnson & Higgins).

13. *Id.* at 130–31; PX 14 (Johnson & Higgins premium invoice); PX 15 (quarterly report).

14. Stipulation of Facts ¶ 3; Tr. at 91–95 (Welles testimony).

15. Tr. at 136 (remarks of George Clarke, plaintiff's counsel).

16. Tr. at 146–47 (testimony of Daniel St. Jacques, defendant's marine insurance expert).

17. The policy is reprinted in PX 1. Unless otherwise noted, all subsequent quotations from the policy are drawn from that exhibit.

18. PX 17 (Endorsement No. 13).

Clause 9(A) states in relevant part:

This insurance attaches from the time the goods leave the Warehouse and/or Store at the ... commencement of the transit and continues during the ordinary course of transit ... until the goods are discharged overside from the overseas vessel at the final port.

The core language of clause 27 reads: ON SHIPMENTS SOLD ON SIGHT DRAFT TERMS–PAYMENT AGAINST DOCUMENTS—Notwithstanding anything to the contrary contained herein, this policy covers the Assured against loss or damage (by perils covered by this policy) to merchandise insured hereunder until the documents have been taken up by the consignees and actual payment made by them but not after delivery into consignees' warehouse.

The reference to "perils covered by this policy" in clause 27 requires recourse to the first printed paragraph of the policy, which details the traditional marine perils:

[adventure and perils] of the seas, men-of-war, fires, enemies, pirates, rovers, assailing thieves, jettisons, letters of mart and countermart, reprisals, takings at sea, arrests, restraints, and detainments of kings, princes or peoples ..., barratry of the master and mariners, and all other perils, losses, and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandises or any part thereof.

As distinguished from most other provisions contained in the policy, clause 31(A) refers specifically to Buckeye:

This policy is extended to cover the interest of The Buckeye Cellulose Corporation with respect to export shipments sold on F.A.S., F.O.B. or similar terms whereby insurance for the ocean voyage is arranged by others than the Assured. This insurance to attach at the time title and risk of loss passes to the buyer and covers continuously thereafter, subject to all the terms and conditions of this

policy, until the Assured receives payment and/or an irrevocable letter of credit is opened in the name of the Assured whichever first occurs.

Clause 6(E) provides:

This policy covers increased value on shipments of ... Oils ... in bulk or in packages purchased by the Assured on C.I.F. terms, said increased value being valued at the amount by which the valuation under this policy exceeds the insurance furnished by the sellers....

Finally, Endorsement 32 (dated April 15, 1975) states in pertinent part that:

On shipments made by the Assured on terms whereby the Assured is not obligated to furnish ocean marine insurance, or on shipments purchased by the Assured on C.I.F. or similar terms whereby marine insurance is arranged by others, it is agreed that at the option of the Assured provided such option is availed of prior to any known or reported loss of damage, and in consideration of the declaration of the values on such shipments and payment of premium thereon, these Assurers will guarantee to the Assured the prompt collection of losses which otherwise would have come within the terms of this policy.

### II.

This suit presents two questions of contract interpretation: Did the insurance policy cover the type of loss Buckeye suffered? Did the policy cover this cottonseed oil shipment? For the plaintiff to prevail, the answers to both questions must be affirmative.

### A.

Buckeye's loss was caused by the improper release of bills of lading with the result that its cargo was converted. *See R.L. Rothstein Corp. v. Kerr Steamship Co.,* 21 App.Div.2d 463, 251 N.Y.S.2d 81 (1st Dept.1964) (carrier's agent, by issuing bill of lading and thereby conferring right of possession to goods on another, convert-

ed goods in derogation of possessory interest of unpaid seller who held mate's receipt which provided that no bill of lading should be issued without surrender of receipt), *aff'd*, 15 N.Y.2d 897, 258 N.Y.S.2d 427, 206 N.E.2d 360 (1965).

■ Clause 12 of the policy is the starting point for an inquiry into what risks are insured. The clause begins:

All goods and/or merchandise shipped except as may be hereinafter especially provided, are insured:

A. Against all risks of physical loss or damage from external cause (excluding risks excepted by the F.C. & S. and S.R. & C.C. warranties unless covered elsewhere herein), irrespective of percentage.

The language of 12(A) can be read as providing what is called "all risk" coverage. *See Atlantic Lines Ltd. v. American Motorists Insurance Co.*, 547 F.2d 11, 12 (2d Cir.1976) ("physical loss or damage to the property insured from any external cause"); *Holiday Inns Inc. v. Aetna Insurance Co.*, 571 F.Supp. 1460, 1463 (S.D. N.Y.1983) ("all risks ... of direct physical loss or damage to the above described property from any external cause"). Recovery under an all risk provision will generally be allowed for any fortuitous loss, which has been defined as any loss not resulting from an inherent defect in the cargo or from the intentional misconduct of the insured. *Ingersoll Milling Machine Co. v. M/V Bodena*, 619 F.Supp. 493, 506 (S.D.N.Y.1985). An insured has the burden of showing only the existence of all risk coverage and the occurrence of a fortuitous loss; the burden then shifts to the insurer to demonstrate that the cause of the loss comes within a specific policy exclusion. *Id.* at 504; *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 999 (2d Cir.1974).

■ If clause 12(A) applies to the case at hand, Buckeye's loss would be a covered risk. The only exclusions contained in the all risk language—the F.C. & S. (Free of Capture and Seizure) and S.R. & C.C. (Strikes, Riots and Civil Commotions) warranties—are not relevant to the circumstances of Buckeye's loss. And there is authority for the proposition that such all risk language covers the type of loss Buckeye suffered. *See, e.g., Great Northern Insurance Co. v. Dayco Corp.*, 620 F.Supp. 346, 350–51 (S.D.N.Y.1985) ("All Risks of Direct Physical loss" held to include theft by false pretenses); *Murray Oil Products, Inc. v. Royal Exchange Assurance Co.*, 21 N.Y.2d 440, 445–46, 288 N.Y.S.2d 618, 620–21, 235 N.E.2d 762, 764 (1968) ("physical loss" held to cover warehouseman's failure to deliver vegetable oil to bailor); *Tuchman v. Public Service Mutual Insurance Co.*, 88 Misc.2d 336, 337–38, 387 N.Y.S.2d 803, 805 (N.Y.Civ.Ct.1976) (identical language to that in clause 12(A) held to encompass theft of yacht).

The difficulty is that clause 12(A), by its own terms ("except as may be hereinafter especially provided"), is superceded by later clauses covering specific types of cargo. One such clause is 12(D), which sets out the terms of coverage for oils and liquids. The portion of clause 12(D) relevant to this lawsuit was replaced by Endorsement No. 13 (dated Oct. 6, 1970), and witnesses for both sides testified that the language of clause 12(D) as expressed in Endorsement 13 provides the operative terms of coverage for the subject cottonseed oil shipment.[19]

The basic type of insurance coverage provided by clause 12(D) as amended (reprinted, *supra*, in section I–D) is expressed with the words, "Subject [to] Particular Average Irrespective of Percentage." Otherwise known as "With Average" coverage, this form of insurance gives the assured protection against partial or total losses caused by sea perils insured against. L. Buglass, *Marine Insurance and Gener-*

---

**19.** Tr. at 109–15 (Welles testimony); Tr. at 158–59 (St. Jacques testimony). Apparently, Endorsement No. 18 (dated July 30, 1971), although it "cancelled and simultaneously reinstated" Endorsement 13 among others, did not in the opinions of the insurance experts who testified make any changes to the policy which would affect the risk coverage described in clause 12(D) as amended by Endorsement 13.

*al Average in the United States*, 116, 167, 169 (2d ed. 1981).[20] The percentage term indicates that this coverage is provided without a deductible, known as a "franchise." *Id.* at 169.[21] In order to determine what sea perils are insured against, it is necessary to consult the policy's perils clause.[22] That clause (reprinted, *supra,* in section I–D) contains only one risk that could arguably encompass the conversion that caused Buckeye's loss in this case: "assailing thieves." This term, however, "implies theft accompanied by violence and does not include clandestine theft." L. Buglass, *Marine Insurance* at 63 (surveying history of phrase in American and English law). Moreover, the "and all other perils, losses and misfortunes...." language in the policy's perils clause would seem to encompass only perils similar in kind to those specifically mentioned, *id.* at 64, and in keeping with the maxim of *ejusdem generis* would not cover Buckeye's loss in this case.

It can be seen then that in contrast to clause 12(A), clause 12(D) as amended does not provide all risk coverage for cargo such as cottenseed oil to which it is applicable. Buckeye's witness, David Welles of Johnson & Higgins, affirmed that conclusion.[23]

Clause 12(D) goes on in subclause (1)(a), however, to state: "Notwithstanding these With Average conditions, this insurance (a) to pay for actual shortage and/or loss in weight and/or leakage from any external cause [with standard exclusions for wars, strikes, riots, etc. and an exclusion for unexplained shortages]" and then establishes a ½% deductible. The meaning of this second part of the clause is muddy. Buckeye focuses on the language "short-

age ... from any external cause" and argues that conversion of the entire cargo comes within such coverage. Mr. Welles expressed the opinion that a loss from any external cause would include a loss from theft,[24] but the witness declined to offer his opinion as to whether the actual policy as written covered the conversion of Buckeye's shipment, claiming lack of expertise.[25]

Atlantic appears to argue that although the "shortage ... from any external cause" subclause provides additional coverage beyond that provided by the With Average coverage,[26] and such language would cover a shortage arising from theft—a partial theft,[27] the policy would not cover total theft—a complete loss of product.[28] It was the testimony of Atlantic's insurance expert, Daniel St. Jacques, that the "shortage-loss in weight-leakage" language of the second part of clause 12(D) does not comprehend total loss of product.[29] He also testified, however, that the theft in this case—although a fortuity—was not an "external cause" as that term is used in marine insurance.[30]

The question of whether clause 12(D) covers the conversion of Buckeye's cargo is a close one. In reaching a decision, I am guided by two principles of contract interpretation. First, in construing the language of a policy of insurance, "the standard is what a normally constituted person would have understood it to mean in its actual setting." *Atlantic Lines Ltd. v. American Motorists Insurance Co.,* 547 F.2d 11, 13 (2d Cir.1976). Second, although it has been stated that any ambiguity in an insurance policy must be construed against the underwriter, *i.e.,* most favorably to the

---

**20.** *See also* Tr. at 135 (Welles testimony); Tr. at 159–60, 179 (St. Jacques testimony).

**21.** *See also* Tr. at 177 (St. Jacques testimony).

**22.** Tr. at 108–09, 114–15 (Welles testimony).

**23.** *Id.* at 114–15; *see also* Tr. at 160 (St. Jacques testimony).

**24.** Tr. at 111 (Welles testimony).

**25.** *Id.* at 108, 110–11.

**26.** Tr. at 135 (remarks of Joseph McGrath, defendant's counsel); Tr. at 160 (St. Jacques testimony).

**27.** Tr. at 174–75 (St. Jacques testimony).

**28.** *Id.* at 175–76.

**29.** *Id.* at 176.

**30.** *Id.* at 180–81.

assured, L. Buglass, *Marine Insurance* at 85, a leading treatise on insurance warns:

> The policy is not to be construed strictly against the insurer when the language in question was supplied by the insured or by his broker. At any rate, the rule for the determination of an ambiguity in a manner favorable to the insured loses much of its force where the contract of insurance is prepared by the insured.

2 *Couch on Insurance 2d* § 15:78 at 389 (rev. 1984) (footnotes omitted). A recent New York case confronting a similar situation applied the accepted rule that ambiguity in a contract, insurance or otherwise, should be resolved against the drafter:

> [I]f the policy language is considered ambiguous or open to doubt, any ambiguity or doubt must be resolved against Metpath [the insured] and in favor of Birmingham [the insurer] since the drafter of the insurance policy was Metpath's agent, J & H [the broker]....

*Metpath, Inc. v. Birmingham Fire Insurance Co. of Pennsylvania*, 86 App.Div.2d 407, 412–13, 449 N.Y.S.2d 986, 989 (1st Dept.1982).

■ There are two principal obstacles to a finding that clause 12(D) covers the conversion of Buckeye's cargo. First, the ordinary meaning of terms such as "shortage," "loss of weight," and "leakage" would not seem to encompass a total loss, such as occurred here. Second, and more important, however, is the meaning to be ascribed to the relevant portion of 12(D) read as a whole. Buckeye would have us read the "actual shortage ... from any external cause" language as, in essence, an all risk provision that extends coverage beyond the named perils of the sea. This interpretation is not without support. For example, both the "external cause" language and the "F.C. & S. and S.R. & C.C." exclusions closely track the "all risk" phrasing found in clause 12(A). And the exclusion of "all claims for unexplained shortage" really makes much more sense attached to an all risk provision (where in the absence of the exclusion any fortuitous loss would be compensable, *see Atlantic*

*Lines*, 547 F.2d at 13) than included with coverage that insures only specified causes of loss, such as named perils.

On the other hand, attributing to clause 12(D)(1)(a) all risk coverage of total losses would utterly negate or render meaningless the With Average terms that precede 12(D)(1)(a) and that are assumed to apply generally to shipments of liquids and oils. It is not enough to point to the phrase, "Notwithstanding these With Average conditions," that precedes the subclause. If Buckeye's interpretation of 12(D)(1)(a) were to govern, the primary 12(D) coverage indicated by the "Subject [to] Particular Average" term would inform the reader that partial and total losses are covered if and only if they result from one of the perils listed in the policy's perils clause, while the "shortage ... from any external cause" language following would inform the reader that the very same types of cargo are protected against partial or total losses from all risks with the exception of unexplained losses. This level of inconsistency within a single subsection of a policy clause is untenable.

A more harmonious construction of clause 12(D) would read 12(D)(1)(a) as an inartful way of introducing the ½% deductible. This is plausible because since the With Average coverage was stated as "Irrespective of Percentage," it would make sense to introduce the deductible provisions with the phrase, "Notwithstanding these With Average conditions," and to speak in terms of shortages, weight losses and leakages—which refer to partial losses (deductibles are not an issue when losses are total). Admittedly, this interpretation of the policy could have been more simply expressed: "Subject to particular average, if amounting to ½%." The court's task is to seize on the most plausible interpretation under the circumstances, however, not to pursue elegance of drafting. To the extent that this reading of clause 12(D) construes the ambiguity in the policy against the insured, Buckeye, it is consistent with the

accepted rules of contract interpretation discussed above.[31]

### B.

The second question to be resolved is whether, regardless of whether conversion is a covered risk under the policy, the policy ever attached to the subject shipment of cottonseed oil. The starting point for an inquiry into which shipments are covered is clause 3 (reprinted, *supra,* in section I–D), which provides that coverage extends to all goods "shipped by or to the Assured or ... in which the Assured may have an interest in any way...." Read in its narrowest sense, clause 3 merely expresses a basic principle of insurance law that in order to keep insurance policies from being gambling contracts the insured is required to have an interest in the item insured. However, in light of the fact that this was an open marine cargo policy, which one witness defined as "an insurance contract that is designed to attempt to pre-identify the risks that the insurer wants to insure, and the terms and conditions that [the assured] wants to insure in consideration of a premium that he has agreed or pre-agreed to pay," [32] clause 3 could be read as specifying that the policy would attach to all shipments to or from P & G in which it had an insurable interest. Such a broad reading is supported by provisions like the "Warehouse to Warehouse" clause, 9(A) (reprinted, *supra,* in section I–D), which states without qualification that insurance attaches from the time goods leave the warehouse until discharged from the vessel at the port of destination.

The difficulty with investing clause 3 with such significance in terms of coverage boundaries is that, read in such a manner, it is plainly inconsistent with other policy provisions. For example, Endorsement No. 32 (dated April 15, 1975) (reprinted, *supra,* in section I–D) gives P & G the *option* to choose coverage of "shipments made by the Assured on terms whereby the Assured is not obligated to furnish ocean marine insurance [*e.g.,* the F.O.B. sale in this case], or ... shipments purchased by the Assured on C.I.F. or similar terms." The uncontestable implication is that such "shipments" would not be covered under the policy unless P & G exercised its option. Witnesses for both sides recognized the incompatibility of Endorsement 32 with clause 3.[33] Clause 6(E) (reprinted, *supra,* in section I–D) also appears to be inconsistent with an expansive reading of clause 3 in that it provides coverage for increases in valuation of shipments purchased by P & G on C.I.F. terms when coverage provided by the seller is insufficient. The implication is that purchases by the assured on C.I.F. terms are not otherwise covered under the policy, a coverage limitation not expressed in clause 3.[34]

Consequently, it is necessary to go beyond clause 3 to determine whether coverage attached to Buckeye's shipment of cottonseed oil under the policy. The parties focus on two additional clauses to support their respective positions on the policy's coverage of Buckeye's cottonseed oil shipment. Buckeye cites clause 27 (reprinted, *supra,* in section I–D), which governs "shipments sold on sight draft terms-payment against documents," as providing for

---

**31.** An additional, though less important, reason for interpreting the policy as not conferring all risk coverage upon the shipment in this case is that clause 27—the clause which Buckeye contends provides that the policy attaches to the shipment, *see infra* section II–B—states that the "policy covers the Assured against loss or damage (by perils covered by this policy) to merchandise insured hereunder." The wording, "perils covered by this policy," is more logically read as incorporating the traditional marine perils set out in the first printed paragraph of the policy than as importing all risk coverage. As discussed above, the sea perils detailed in the

policy would not include conversion by documentary fraud, and therefore reference to clause 27 lends further support to the conclusion that the coverage provided by clause 12(D) does not encompass the type of loss Buckeye suffered in this case.

**32.** Tr. at 96 (Welles testimony).

**33.** *Id.* at 126–27; Tr. at 154–58 (St. Jacques testimony).

**34.** *See Tr.* at 149–52 (St. Jacques testimony).

coverage "until the documents have been taken up by the consignees and actual payment made by them." Since the valid documents of title—the mate's receipts—were never taken up by TPGC and payment was never made, Buckeye argues that the goods continued to be covered under the policy.[35] Atlantic, on the other hand, points to clause 31(A) (reprinted, *supra*, in section I–D), which specifically governs Buckeye's export shipments sold on F.O.B. terms and provides: "This insurance to attach at the time title and risk of loss passes to the buyer and covers continuously thereafter … until the Assured receives payment and/or an irrevocable letter of credit is opened in the name of the Assured whichever first occurs." Reasoning that the shipment in this case was a letter of credit transaction and the letter of credit was opened by TPGC before the goods entered transit, Atlantic argues that coverage never attached to the cottonseed oil.[36]

Deciding whether either or both such clauses apply—or govern—requires a determination of the nature of the transaction at issue and a reconciliation of the role of the two clauses in the policy. Beyond this, however, the meaning of the applicable provisions must be considered in the context of the history of the parties' actions in relation to the policy.

As an initial matter, I find that the three contracts between Buckeye and TPGC for the sale of the cottonseed oil called for both "sight draft-payment against documents" terms and the opening of a letter of credit. The testimony of Philip Horldt, who was the export oil manager in Buckeye's crushing division at the time of this sale, established that while Buckeye maintained a policy of selling "cash against documents" in order to retain title to the cargo until being paid for the sale, it also required a letter of credit when dealing with some customers

as a guarantee of performance, a financial guarantee.[37] Moreover, although the letter of credit issued in this case incorporated sight draft terms, and thus provided all the protection of payment against documents terms plus the financial guarantee of the issuing bank, Credit Lyonnais, the testimony of Buckeye's witness, Prof. Gerald McLaughlin, a professor of commercial law at Fordham Law School, was persuasive that the underlying contract between Buckeye and TPGC—governed by payment against documents terms—was distinct from the letter of credit contracts between TPGC and the bank and between the bank and Buckeye.[38] Prof. McLaughlin also pointed out that letters of credit do not always incorporate a sight draft term in that some letters of credit "state that the bank engages to accept a draft drawn by the seller on it and payable a certain specified number of days after acceptance, a so-called acceptance draft,"[39] and therefore it would appear that letter of credit terms do not necessarily "swallow up" payment against documents terms in the underlying sales contract.

It is fair to say, then, that both clauses, 27 and 31(A), apply by their terms to the transaction at issue. The question becomes which of the two clauses ought to govern, since as applied to the facts of this case clause 27 would seem to maintain coverage of the shipment during the entire journey while clause 31(A) would never have permitted coverage to attach. Several considerations argue in favor of clause 31(A)'s supremacy. First, clause 31(A), as distinguished from clause 27 and virtually all other provisions of the insurance policy, refers to Buckeye by name instead of using the word "assured" to designate P & G and its subsidiaries. Second, it is rational, in situations in which the protection afforded the seller by payment against documents terms is supplemented by the financial

---

**35.** *See* Tr. at 105–07 (Welles testimony).

**36.** *See* Tr. at 153–54 (St. Jacques testimony).

**37.** Tr. at 12–15 (testimony of Philip Horldt, former Buckeye export manager); *see also* PX 9 (memo report).

**38.** Tr. at 69–71, 75, 86 (testimony of Prof. Gerald McLaughlin).

**39.** *Id.* at 71–72.

guarantee of a letter of credit, that insurance coverage would terminate earlier—by virtue of clause 31(A)—than if only payment against documents terms were present—and clause 27 alone applied. Third, were clause 27 to take precedence over clause 31(A) in a letter of credit transaction such as the one in this case involving sight drafts, the only situations in which clause 31(A)'s provision for the termination of coverage upon the opening of a letter of credit would apply would be those involving letters of credit specifying acceptance drafts. But such a result would be anomalous, since the policy would then provide insurance in situations in which a bank engaged to make payment immediately upon presentation of documents while withholding such coverage in situations in which payment might not be made for days or months after presentation.[40]

A reconciliation of the two competing clauses thus results in a conclusion that coverage under the policy does not attach to Buckeye's cottonseed oil shipment pursuant to the specifications of clause 31(A). Even assuming *arguendo* that clause 27 were found to govern the policy's coverage with respect to Buckeye's cottonseed oil shipment, however, we would be extremely hesitant to find that the policy attached to the shipment in view of the strong inferences to be drawn from Buckeye's conduct that it did not believe its F.O.B. sales to be covered under the policy.[41]

First, and most important, Buckeye has admitted in response to a demand for admissions by Atlantic that with the exception of the subject shipment:

> From the inception of the policy in suit in 1968 neither plaintiff, nor Procter and Gamble, nor any other entity insured thereunder has reported to defendant or paid premium upon any export shipment as to which it had no contract obligation to provide marine insurance.

*Compare* Defendant's Demands For Admissions (dated Dec. 22, 1982) *with* Plaintiff's Response To Defendant's Demand For Admissions (dated Feb. 14, 1983). Mr. Horldt confirmed this at trial, stating that in his experience Buckeye made only F.O.B. sales and never reported them to P & G's insurance department.[42] The significance of this customary past practice on Buckeye's part is that it reveals the firm's practical construction of the policy to be in direct conflict with its theory of why coverage attached to the subject shipment under clauses 3 and 27. The testimony of Buckeye's expert witness, Mr. Welles, is instructive in this regard:

> The genesis of the clause [27], I am going back to 1968, is a situation where if everything went right and the documents were presented and so honored, you could have a time span where the vessel could sail and be at sea before the documents could be physically collected

---

**40.** The argument made implicitly during the trial by plaintiff's counsel, *see* Tr. at 124 (remarks of George Clarke), to the effect that clause 31(A) would not apply to this transaction because the letter of credit fell apart is unpersuasive. Under such a theory the event terminating coverage under a letter of credit transaction would be successful presentation of documents to the issuing bank—in the instant case accompanied by payment on a sight draft—instead of the opening of the letter of credit. Yet the drafters of clause 31(A) clearly distinguished between the time when payment is received and the time when an irrevocable letter is opened. Buckeye's conception would render that distinction meaningless (in many if not most instances) and would ignore the plain terms of the clause.

**41.** Buckeye argues in its trial brief that its failure to declare prior, similar shipments does not

constitute a waiver of coverage on later shipments. *See* Plaintiff's Trial Brief at 15. It is a different matter, however, and Buckeye does not argue otherwise, that its prior conduct with regard to the declaration of shipments is relevant to the question of Buckeye's or P & G's own understanding of the insurance policy's coverage terms. *See id.* at 15, 17. It is an accepted principle of contract interpretation that when there exists doubt or ambiguity as to the meaning of a contract the practical construction placed upon it by the conduct of the parties over a period of years, before any controversy arises as to its meaning, affords one of the most reliable means of determining the contract's meaning. *See* 4 S. Williston, *A Treatise On the Law of Contracts* § 623 (3d ed. 1961); A. Corbin, *Corbin on Contracts* § 558 (1952).

**42.** Tr. at 38–39, 44, 49 (Horldt testimony).

and presented to the bank or the buyer or whomever for payment, and if indeed there was a casualty prior to them being able to present these documents, the buyer to some extent could refuse to accept them and not pay for them.[43]

\*     \*     \*     \*     \*     \*

Q. Clause 3 covers, would then cover shipments which the insured had an interest in any way, is that correct?

A. I believe the clause reads that way.

Q. It is your testimony that when Procter & Gamble or Buckeye held the title documents to the cargo while it was at sea they had an interest in that cargo, is that correct?

A. Yes.[44]

The reason the foregoing interpretation of the policy is at odds with Buckeye's failure to declare its F.O.B. export shipments is that whether a given F.O.B. sale is on payment against documents or letter of credit terms, the oil is likely—if not certain—to be at sea for at least some time before payment or presentation. This is so because under either arrangement Buckeye must take up documents of title such as mate's receipts before exchanging/presenting them for payment—and those documents of title are apparently only issued when the cargo is loaded on the vessel. In short, had Buckeye acted in accordance with its claimed understanding of the policy terms, it would have declared any number of prior F.O.B. shipments for the number of days they were at sea prior to Buckeye's having received payment.

A good example is the transaction in this case. Between January 31, when the first cargo of cottonseed oil was loaded on the Globe Venus, until February 20 or later, when Credit Lyonnais informed Buckeye's bank that it would not waive late presentation of documents, there was a cargo afloat to which Buckeye had not surrendered title and for which Buckeye had not been paid. To that point, a period of three weeks, Buckeye had no reason to expect that the transaction would proceed in any but a regular fashion, and, with the exception of the delay in gathering the documents, it was apparently a typical letter of credit export transaction. The point of this illustration is to show that Buckeye's interpretation of the insurance policy would seem to require that it declare even its routine F.O.B. export shipments, those that proceed without incident. Its historical practice, however, was not to declare. Put another way, it was not the failure of the letter of credit transaction or TPGC's failure to make payment according to the contract of sale that brought the cottonseed oil shipment within the coverage terms of the insurance policy. Rather, under Buckeye's view of clause 27, the shipment was insured not only from January 31 until February 16 (when the letters expired) or February 20 (when late presentation was not waived) but from that time until March 14 (when Buckeye appears to definitively have ascertained that the cargo had been converted).[45]

In view of the foregoing chronology, there is a second aspect of Buckeye's conduct that gives rise to the inference that it did not understand its cargo to be covered by the policy: Buckeye never declared the cottonseed oil shipment for premium purposes. The point is not that Buckeye has waived coverage by not notifying Atlantic of the loss; P & G's and Johnson & Higgins' April 1979 communications surely notified Atlantic of the claim. Rather, Buckeye's failure to report in its May 23 quarterly declaration covering the period December through February a shipment that sailed from the Gulf Coast on February 2 is some evidence of Buckeye's systematic practice of not reporting F.O.B. sales for insurance purposes. Robert Koch, a member of P & G's insurance department at the time of the transaction, testified that the information on which the quarterly report was based was received by his department up until the day before the report was

**43.** Tr. at 107 (Welles testimony).

**44.** *Id.* at 113.

**45.** Tr. at 33 (Horldt testimony).

prepared.[46] Given the fact that the shipment departed on February 2 and arrived in Egypt on February 28, it is hardly a sufficient explanation for not including it in the May 23 quarterly report that the insurance department did not receive any information about the shipment in writing.[47] Moreover, Buckeye's position that its April notification to Atlantic of its claimed cargo loss was also intended to serve as a declaration of the shipment for insurance purposes [48] is simply not credible, in view of what must have been P & G's clear understanding that Johnson & Higgins' premium invoices would be based exclusively on its quarterly reports.

It would seem that an insured party's past and contemporaneous record of declaring shipments for premium purposes is a very strong indication of its understanding of the coverage provided by an open marine cargo policy.

\*  \*  \*  \*  \*  \*

In sum, I conclude that the Atlantic marine cargo insurance policy covered neither the type of loss suffered by Buckeye nor the subject cottonseed oil shipment itself. This Memorandum constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. Accordingly, for the reasons expressed above, judgment is granted dismissing the complaint.

It is so ordered.

---

**46.** Tr. at 53–54 (testimony of Robert Koch, former P & G staff accountant, insurance department).

**47.** *Id.* at 61–62.

**48.** *Id.* at 60, 64.